# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER, ON BEHALF OF THE EMPLOYEES' RETIREMENT SYSTEM OF RHODE ISLAND,

Plaintiff,

v.

PARAMOUNT GLOBAL,

Defendant.

C.A. No. 2024-0457-SEM

## MEMORANDUM OPINION CERTIFYING INTERLOCUTORY APPEAL

Date Submitted: March 13, 2025
Date Decided: March 24, 2025

Michael Hanrahan, Corinne Elise Amato, Eric J. Juray, Stacey A. Greenspan, Seth T. Ford, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Lee D. Rudy, Eric L. Zagar, Grant D. Goodhart, Michael W. McCutcheon, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff*.

Jon E. Abramczyk, D. McKinley Measley, Alexandra M. Cumings, Louis F. Masi, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jonathan K. Youngwood, Meredith Karp, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendant*.

**LASTER, V.C.**

A stockholder served a demand for books and records to explore possible corporate wrongdoing. The corporation responded that the stockholder failed to articulate a proper purpose. After attempts at engagement failed, the stockholder filed this enforcement action. The court found after trial that the stockholder proved its proper purpose by establishing the existence of a credible basis to suspect possible corporate wrongdoing (the "Proper Purpose Decision").[1]

To meet its burden, the stockholder introduced some evidence pre-dating the demand, some evidence post-dating the demand, and some evidence post-dating the filing of the enforcement action. Treating the credible basis standard as if it were a subjective test, the corporation insisted that what mattered is only what the stockholder knew when making its demand, meaning that the stockholder could not rely on post-demand or post-petition evidence.

The Proper Purpose Decision rejected any categorical rule to that effect. The credible basis test is not subjective. The stockholder must convince the court by a preponderance of the evidence that an objectively credible basis exists to suspect corporate wrongdoing. Relying on the language and structure of Section 220 and on prior precedent, the Proper Purpose Decision recognized that a court can consider post-demand or post-petition evidence under appropriate circumstances. In the context of this case, the court determined that the stockholder properly relied on both

---

[1] *R.I. Off. of Gen. Treasurer ex rel. Empls.' Ret. Sys. of R.I. v. Paramount Glob.*, — A.3d —, 2025 WL 324227 (Del. Ch. Jan. 29, 2025) [hereinafter *PPD*].

types of evidence. That evidence supported the what the stockholder initially cited in the demand, did not exist before the stockholder made the demand and therefore could not have been cited in the demand, and was not prejudicial to the corporation because it concerned the corporation's own acts. The post-demand and post-suit evidence also included the corporations public filings with the SEC, which a court should be able to freely consider.

The Proper Purpose Decision also took into account the importance of judicial efficiency. Forcing a stockholder to go back to the beginning and make a new demand would necessitate seriatim enforcement actions and waste judicial resources.

The corporation also objected that the stockholder introduced news articles that cited confidential sources. The corporation asserts that a stockholder cannot rely on information provided by confidential sources absent sufficient insight into the identity of those sources and the veracity of their statements to enable the court to make a favorable finding regarding the speakers' credibility. Because the sources are confidential, the corporation's proposed standard would be quite hard to meet, which seems to be the point.

The Proper Purpose Decision rejected any categorical rule about confidential sources. The court considered the forty-seven articles that the stockholder submitted. Summarizing its review, the court noted that the articles appeared in leading and reputable publications, many with policies about the responsible use of confidential sources. Experienced, respected, and often prize-winning journalists wrote the articles. Those articles cited the sources for specific points and used standard

terminology, such as "people close to the negotiations." The corporation's public filings with the SEC generally corroborated the contents of the articles. The court also relied on its own accumulated knowledge about how the media works in M&A settings, where the individuals offering quotations to the press are typically public relations firms representing the parties, investment bankers, and (less frequently) lawyers or corporate insiders. The court found that the articles and the quotations they contained did not bear indicia of unreliability. Instead, they bore sufficient indicia of reliability to be considered in the proper purpose analysis.

The corporation now asks the court to certify those two aspects of the Proper Purpose Decision for interlocutory appeal (the "Application").[2] Although the Application mischaracterizes the Proper Purpose Decision and makes dubious predictions about its dire consequences, the Delaware Supreme Court's insights on those issues would be helpful and can be obtained efficiently now through an interlocutory appeal. This decision grants the Application, thereby recommending that the Delaware Supreme Court accept the appeal.

## I.     FACTUAL BACKGROUND

Paramount Global ("Paramount" or the "Company")[3] is a Delaware corporation with two classes of publicly traded common stock. The Class A shares carry voting

---

[2] Appl., Dkt. 70. Citations in the form "Dkt. ____" refer to docket entries. Citations in the form "JX ____ at ____" refer to joint trial exhibits; page citations refer to the last three digits of the control or JX number.

[3] The Company's name is just "Paramount Global"; there is no "Inc." or other standard corporate signifier. *PPD* at *1 n.2.

3

rights. The Class B shares do not. National Amusements, Inc. ("NAI") controls the Company through its ownership of Class A shares. Shari Redstone controls NAI. Through her control over NAI, she controls the Company.

In late 2023, Redstone began exploring a sale of NAI. There were indications that she sought to sell NAI or its control block for a premium rather than engaging in a Company-level transaction that would benefit all of the Company's stockholders.

On April 5, 2024, the Employees' Retirement System of Rhode Island (the "Stockholder") served a demand for books and records on the Company (the "Demand"). The Demand expressed concern about Redstone and NAI usurping corporate opportunities by channeling potential buyers toward a purchase of NAI or its control block.

To investigate that potential wrongdoing, the Demand sought board-level and officer-level materials concerning (i) any actual, potential, or proposed sale, merger, or other business combination involving NAI, the Company, or any of the Company's assets, (ii) any committee of the Board empowered to evaluate such a transaction, and (iii) the adoption of change-in-control agreements for Company management. The Demand also sought informal materials including emails and text messages.

After the Stockholder served the Demand, media outlets published more stories about Redstone's activities. For example, on April 10, 2024, citing "people familiar with the situation," the *Wall Street Journal* reported that four Company directors were stepping down, including three members of a special committee

4

empowered to oversee the Company's pursuit of strategic opportunities.[4] The same story reported that at least one of the departing directors referenced concern about the transaction Redstone favored.[5] The Company later confirmed their departures in an SEC filing.[6]

Meanwhile, on April 19, 2024, the Company responded to the Demand. The Company asserted that the Demand did not state a proper purpose and was overly broad. Despite rejecting the Demand, the Company offered to confer with the Stockholder about a mutually acceptable production. The Company contemplated producing a single document.

On April 30, 2024, the Stockholder filed this action. The Chancellor assigned the case to a magistrate judge. As the litigation unfolded, media outlets published more stories suggesting Redstone had engaged in potential misconduct.

On July 24, 2024, the magistrate judge conducted a trial on a paper record and recommended that the court rule in the Company's favor. The magistrate judge credited the Company's argument that the Stockholder had not established a sufficient evidentiary foundation to support a proper purpose for an investigation.

---

[4] JX 40 at '001.

[5] *Id.* at '002.

[6] *See* JX 44.

5

The Stockholder took exceptions to the report. As required by Delaware Supreme Court precedent,[7] the court conducted a *de novo* review of the record and issued the Proper Purpose Decision on January 29, 2025. On February 25, 2025, the court approved a stipulated form of order remanding the case to the magistrate judge to determine the books and records that the Stockholder could obtain.

On March 7, 2025, the Company filed the Application. The Company does not seek to appeal all of the rulings in the Proper Purpose Decision. The Company only asks the court to certify two: (1) the court's finding that the Stockholder properly relied in this case on articles that post-dated the Demand or the filing of the enforcement action, and (2) the court's finding that the Stockholder properly relied in this case on articles citing confidential sources.

## II. LEGAL ANALYSIS

Supreme Court Rule 42 governs the certification of interlocutory appeals. "[T]he purpose of Rule 42 is to prevent wasteful piecemeal litigation from overwhelming the docket of the Supreme Court."[8]

Rule 42 cautions that "[i]nterlocutory appeals should be exceptional, not routine, because they disrupt the normal procession of litigation, cause delay, and can threaten to exhaust scarce party and judicial resources."[9] Certification is

---

[7] *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

[8] *Stein v. Blankfein*, 2019 WL 3311227, at \*1 (Del. Ch. July 23, 2019).

[9] Supr. Ct. R. 42(b)(ii).

"generally not favored."[10] Thus, an application for interlocutory appeal "requires a strict analysis by the trial court."[11]

Rule 42 states that "[n]o interlocutory appeal will be certified by the trial court or accepted by this Court unless the order of the trial court decides a substantial issue of material importance that merits appellate review before a final judgment."[12] To apply this test, the trial court first asks whether the interlocutory order decided a substantial issue of material importance. If so, then the trial court must analyze whether "there are substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal."[13] The rule identifies eight factors relevant to the assessment.[14] Only if both criteria are met can the trial court certify the interlocutory appeal.

## A. Whether The Application Is Timely

As a threshold matter, the Stockholder argues that the Application was untimely. The court cannot agree.

Under Supreme Court Rule 42, a party must seek interlocutory review "within 10 days of the entry of the order from which the appeal is sought or such longer time

---

[10] Supr. Ct. R. 42 cmt.

[11] *Chemours Co. v. DowDuPont Inc.*, 2019 WL 2404817, at *1 (Del. Ch. June 7, 2019).

[12] Supr. Ct. R. 42(b)(i).

[13] Supr. Ct. R. 42(b)(ii).

[14] Supr. Ct. R. 42(b)(iii)(A)–(H).

as the trial court, in its discretion, may order for good cause shown."[15] Untimely applications for interlocutory appeal are generally denied absent a showing of good cause.[16] By establishing a requirement to file for interlocutory appeal so promptly, the Delaware Supreme Court plainly intended to incentivize potential applicants to seek appeal quickly so that the overhang of a potential appeal would not interfere with how the case unfolded at the trial court level.

The Stockholder contends that the time for filing the Application began with the issuance of the Proper Purpose Decision on January 29, 2025. The Company did not file the Application until March 7, some five weeks later. That would be too late.

The court also thought initially that the Proper Purpose Decision started the time running under Supreme Court Rule 42, rendering the Application untimely. But upon further review, the court noted the last sentence of the Proper Purpose Decision, which stated: "The parties will submit an implementing order that will return this dispute to the magistrate judge for further proceedings."[17]

---

[15] Supr. Ct. R. 42(c)(i).

[16] *E.g.*, *J.C. Opco, LLC v. Hudson Hosp. Holdco, LLC*, 284 A.3d 725, 2022 WL 4451489, at *1 (Del. Sept. 23, 2022); *Hazzard v. Harris*, 131 A.3d 324, (Del. Jan. 22, 2016) (TABLE); *Jackerson v. Vaughn*, 106 A.3d 1049 (Del. Jan. 22, 2015) (TABLE); *Kulak v. On*, 2024 WL 3178228, at *1 (Del. Ch. June 26, 2024) (ORDER), *aff'd* 320 A.3d 236 (Del. 2024) (TABLE); *Envirokare Composite Corp. v. D&D Mfg., LLC,* 2024 WL 1528695, at *1 (Del. Ch. Apr. 9, 2024) (ORDER).

[17] *PPD* at *16. I typically include a sentence at the end of an opinions requesting an implementing order. I do so with the goal of maintaining good docket hygiene. Normally, having a formal order provides helpful clarity to the parties and makes it easier for everyone to move forward. Sometimes, however, counsel complicate matters. This case marks the third time in my career that the request for

8

Supreme Court Rule 42 refers to the ten-day time period running from "the entry of the order from which the appeal is sought." The Company might have interpreted the language of the rule and the last sentence of the Proper Purpose Decision to suggest that the time for seeking would run from the entry of the implementing order. Although not an irrational reading, it was an arguably self-serving one that further prolonged a books-and-records process that started in April 2024, nearly a year ago. The parties did not submit a form implementing order until February 25, 2025, nearly one month after the court issued the Proper Purpose Decision,[18] and the stipulated form of order did not implement any of the rulings that the Company now seeks to appeal. Its sole operative paragraph consisted of a single sentence: "The Action is returned to the Magistrate Judge for further proceedings regarding the scope of production."[19]

There is authority that could support denying the Application as untimely. In *Kulak*, the court had issued a combination of rulings, most from the bench followed

a formal order has backfired. *Compare XRI Inv. Holdings LLC v. Holifield*, 2024 WL 3517630, at *12-13 (Del. Ch. July 24, 2024) (recounting how, when asked for a stipulated final judgment or a list of issues remaining to be resolved, the parties submitted a stipulated Rule 54(b) order contemplating extensive further proceedings and a separate damages trial, which had not been requested and the court had not contemplated); *State v. AT&T, Inc.,* C.A. No. 2019-0985-JTL, Dkt. 37 (Del. Ch. Aug. 14, 2020) (rejecting plaintiff's proposal, in response to court's request for a stipulated final judgment or a list of issues remaining to be resolved, to file an amended complaint and start the case over again).

[18] Dkt. 68.

[19] Dkt. 69 ¶ 1.

by others in a letter opinion issued eleven days later. The defendants filed a single application asking the court to certify an interlocutory appeal from both the bench ruling and the letter opinion. The court held the application timely for the letter opinion but untimely for the bench ruling. The court reasoned that the time to apply for certification of the bench ruling ran from the time of the ruling, and not from some later date such as the issuance of the letter opinion.[20]

Here, the Company seeks to appeal from the Proper Purpose Decision, not from the implementing order. By analogy to *Kulak*, the Company should have filed the Application within ten days of the Proper Purpose Decision, rather than waiting until the entry of an order that simply returned the case to the magistrate judge. At a minimum, there were grounds for debate over when the time for appeal would run, and the Company might well have moved more quickly to avoid any risk of untimeliness. To err on the side of moving faster would also have been appropriate in a Section 220 action, which is entitled by statute to summary treatment.[21]

Nevertheless, for the Company to base the time for its Application on the date of the implementing order was not so unreasonable as to warrant treating the appeal as untimely. The court will not deny the Application on that basis.

---

[20] *Kulak*, 2024 WL 3178228, at *1.

[21] 8 *Del. C.* § 220(c).

10

**B.** **Whether The Proper Purpose Decision Decided A Substantial Issue Of Material Importance**

When considering an application for interlocutory appeal, the trial court must first consider whether the interlocutory order decided a substantial issue of material importance. "The 'substantial issue' requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[22]

The Company asserts that the Proper Purpose Decision addressed a substantial issue because a proper purpose finding goes to the merits of a Section 220 claim. That rings true.

In a Section 220 case, compliance with the form-and-manner requirements resembles a threshold issue of standing in a liability case, proof of a proper purpose resembles a liability finding on the merits, and determining what books and records are essential and sufficient resembles the remedial phase. In other contexts, a liability determination can satisfy the substantial issue requirement. Most notably, Delaware decisions addressing insurance coverage issues have held that determining whether or not the insurer is liable under the policy constitutes a substantial issue.[23]

---

[22] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at \*1 (Del. Ch. July 22, 2008); *accord Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973).

[23] *See Liggett Gp., Inc. v. Ace Prop. & Cas. Ins. Co.*, 798 A.2d 1024, 1028 (Del.2002) (hearing interlocutory appeal of decision granting summary judgment in favor of the insurers in a dispute over whether liability insurance coverage is available for tobacco-related injuries); *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 606 A.2d 73, 74 (Del.1992) (finding that the right of an insurer to

11

By finding that the Stockholder had a proper purpose, the Proper Purpose Decision ruled on an issue comparable to a determination of liability.

The risk, of course, is that treating a proper purpose finding as a substantial issue could open up Section 220 cases to mid-case review, bogging down the summary nature of the proceeding. Whether the interlocutory ruling decided a substantial issue, however, is only one requirement for certification. Other aspects of the test for interlocutory review guard against excessive appeals.

By contrast, the Company's policy argument for concluding that the Proper Purpose Decision decided a substantial issue makes little sense. According to the Company, the Proper Purpose Decision must have decided a substantial issue because its implications extend "beyond the litigants here."[24] As the Company sees it,

exclude certain claims from coverage is a "substantial issue" sufficient to satisfy the requirements of Supr. Ct. Rule 42); *State Farm Mut. Auto. Ins. Co. v. Abramowicz*, 386 A.2d 670, 671 (Del. 1978) (holding summary judgment decision determining the validity of a contract provision essential to the position of parties established a "substantial issue" and the legal right of the insured to recover damages pursuant to the policy). *See generally AT&T Corp. v. Clarendon Am. Inc. CO.*, 2006 WL 1360934, at *1 (Del. Super. May 18, 2006) (ruling on coverage is a substantial issue); *Shook & Fletcher Asbestos Settlement Tr. v. Safety Nat Cas. Corp.*, 2005 WL 300780, at *2 (Del. Super.) ("The extent of insurance coverage as a matter of law is a substantial issue for purposes of interlocutory appeal."); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, Del. Super., C.A. No. 88C-JA-118, Dkt. 3250 at 2 (May 9, 1994) (Ridgely, H.) (ORDER) (determining that, as with other threshold issues of insurance policy interpretation, an issue that addresses "the extent of insurance coverage as a matter of law" is a substantial issue); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, Del Super., C.A. No. 88C-JA-118, Dkt. 3251 at ¶ 1 (Feb. 10, 1994) (Ridgely, H.) (ORDER) (finding that where the issue "bears directly upon the existence of insurance coverage as a matter of law" it therefore determines "a substantial issue").

[24] Appl. 6.

12

the Proper Purpose Decision "invites stockholders to use the Section 220 demand process to keep corporate books and records open in perpetuity as long as some rumors about the corporation circulate in the news, even if alleged wrongdoing has not occurred."[25] The Company later argues that the Proper Purpose Decision would "permit litigants to use 220 litigation to launch an inquisition into hypothetical-but-as-yet unsubstantiated corporate wrongdoing."[26]

Both are poor attempts at Chicken Little consequences. Both ignore (i) a corporation's independent ability to bring closure to the Section 220 process and (2) more potent incentives that drives how most stockholders proceed when seeking books and records.

First, assuming a stockholder did attempt to keep the demand process open "in perpetuity" or seek documents about "hypothetical-but-as-yet-unsubstantiated corporate wrongdoing," the corporation could simply reject the demand and call the question of the demand's sufficiency. At that point, the stockholder has to sue to enforce the demand or go home.

If the stockholder goes away, good for the corporation. If the stockholder opts to file an enforcement action, then the corporation need not fear a prolonged process. The members of the Court of Chancery strive to decide Section 220 actions in sixty to ninety days; they are not interested in having Section 220 actions persist "in

---

[25] *Id.*

[26] *Id.* at 10.

perpetuity" or as opportunities to explore "hypothetical-but-as-yet-unsubstantiated corporate wrongdoing." If stockholders and their counsel try that, then corporations will find allies in their friendly neighborhood Chancery judges.

Second, whatever the defense lawyers in this case may think about the contingently compensated law firms who often represent stockholder plaintiffs, those firms are rational economic actors. They want to get paid, and they only get paid if they can win or settle a case. To generate a result, a firm and its client must have a case to bring. Not only that, if other firms and their clients are pursuing similar claims, then the firm and its client must secure a role on the leadership team. To have any hope of getting a spot in the leadership group, a firm cannot keep a demand open indefinitely. If they do, another firm and its client will file suit. At that point, the sluggish and slow-going stockholder would have to negotiate its way onto the team. A feckless firm that has done nothing but hope that "rumors about the corporation circulate in the news" will have nothing to offer. The laggardly lawyers also have little chance of prevailing in a leadership fight.

Nor can the formerly sedentary stockholder suddenly push for books and records to demonstrate its worth.

> If one firm has taken noteworthy steps to advance a case, then that favors that firm's application. The court should not enable another firm to swoop in and take over the case without good reason. At the same time, this factor should not promote a tyranny of small differences. For one set of lawyers to have pushed a company to produce a few more books and records does not render their performance inherently superior. Obtaining additional books and records might be noteworthy if the materials address an important topic that another firm discounted

14

or ignored. But being the last holdout for books and records does not automatically equal superior performance.[27]

Defense counsel's drift-net strategy is not a real thing.

Rather than having the effect that defense counsel posit, the Proper Purpose Decision enables the Court of Chancery to handle Section 220 cases efficiently. A stockholder seeking to investigate corporate wrongdoing must prove by a preponderance of the evidence that a credible basis to suspect wrongdoing exists.[28] The Company acts as if the test were subjective such that the proper purpose inquiry rises or falls based on what the stockholder knew when making the demand. But the credible basis standard is not subjective.[29] The court does not review the stockholder's

---

[27] *In re Fox Corp. Deriv. Litig.*, 307 A.3d 979, 989 (Del. Ch. 2023).

[28] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006) ("We reaffirm the well-established law of Delaware that stockholders seeking inspection under section 220 must present 'some evidence' to suggest a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred.").

[29] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1032 (Del. 1996) ("[The stockholder's] subjective belief that wrongdoing has occurred is insufficient to meet the evidentiary burden required to compel inspection"); *Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *5 (Del. Ch. July 30, 2004) (explaining that while the stockholder might have been extra suspicious about the corporation's actions based on past experience, "[t]hat heightened suspicion, however, is not relevant to the issue before the Court—namely, whether Plaintiffs have shown a credible basis from which the Court can infer the possibility of mismanagement").

15

investigative judgment. The stockholder must convince *the court* that an objectively credible basis to suspect wrongdoing exists.[30]

If pertinent and sufficiently reliable information emerges after a stockholder serves a demand, and if considering the evidence is not prejudicial to the corporation, then the court can take it into account when ruling on whether a credible basis to suspect wrongdoing exists. The stockholder need not go back to square one and serve a new demand. Under the Company's proposed rule, a stockholder could not rely on—and the court could not consider—probative evidence under those circumstances. Instead, the Stockholder would have to start over with a new demand and a new enforcement action, leading to more work for everyone. Although the Company finds it convenient to advocate for that wasteful approach in this case, more demands would mean greater burdens for corporations. Serial enforcement actions would certainly lead to greater burdens on the court, something the Company claims that it seeks to avoid. [31]

But even though the Company's scare tactics miss the mark, the Proper Purpose Decision did decide a substantial issue. It therefore can be certified for interlocutory appeal.

---

[30] *Seinfeld*, 909 A.2d at 118 ("[S]tockholders seeking inspection under section 220 must present 'some evidence' to suggest a 'credible basis' from which a court can infer that mismanagement, waste or wrongdoing may have occurred.").

[31] *See* Appl. at 6-7.

**C. Whether The Proper Purpose Decision Warrants Appellate Review Before A Final Judgment**

Determining that the Proper Purpose Decision decided a substantive issue does not mean that certification is warranted. The trial court also must consider whether the ruling warrants appellate review "before a final judgment."[32] When analyzing that issue, Rule 42(b)(iii) instructs trial courts to consider eight factors. The Application takes a jumbled and disorganized approach that fails to analyze the factors clearly. From the Application's citations, the Company seizes on six: (A), (B), (C), (E), (G), and (H).

**1. Whether The Proper Purpose Decision Resolves A Question Of First Impression**

The Application twice cites factor (A),[33] which asks whether the "[i]nterlocutory order involves a question of law resolved for the first time in this State."[34] That factor technically does not apply, but it provides some support for interlocutory review.

Factor (A) technically does not apply because the Proper Purpose Decision did not resolve a question of first impression. Relying on repetition, the Company accuses the court nine times within thirteen pages of adopting a "novel" ruling. Yet the Application simultaneously asserts that other decisions have addressed the issue and that the Proper Purpose Decision conflicts with them. Both can't be true.

---

[32] Supr. Ct. R. 42(b)(i).

[33] Appl. 8, 12.

[34] Supr. Ct. R. 42(b)(iii)(A).

17

Contrary to the Company's claims, the Proper Purpose Decision did not announce a novel rule of law. Quite the opposite, the Proper Purpose Decision expressly declined to "establish rules for all cases."[35] The court instead considered the specific evidence at issue in the case.

The Proper Purpose Decision also did not adopt a novel interpretation of Section 220. The decision interpreted the plain language of the statute by noting that Section 220(b) only requires that the demand "stat[e] the purpose" for the inspection, not that the demand cite evidence.[36] Section 220(c) then calls for a stockholder who sues to enforce a demand to establish at trial that "[t]he inspection such stockholder seeks is for a proper purpose."[37]

Under that structure, the time for the stockholder to prove a proper purpose is at trial, not in the demand. Delaware Supreme Court authorities emphasize the distinction by reviewing *de novo* whether the demand has articulated a legally proper purpose under Section 220(b),[38] while reviewing deferentially a trial court's fact finding about whether the stockholder proved a proper purpose at trial for purposes

---

[35] *PPD* at *11.

[36] 8 *Del. C.* § 220(b).

[37] *Id.* § 220(c)(3).

[38] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997) ("This Court reviews *de novo* the question of a 'proper purpose' under Section 220(b).").

18

of Section 220(c). [39] That means that a stockholder could submit a relatively abbreviated demand, produce evidence about the basis for the demand in discovery, and then present that evidence at trial. A corporation can similarly decline to respond to the demand, obtain discovery from the stockholder, and rely on that evidence at trial. There is no reason to limit either side to what was known at the time of the demand. [40]

The Company contends that the court can only consider what the stockholder subjectively knew when making the demand, but the credible basis standard is not a subjective test. [41] The stockholder must convince *the court* that a credible basis to suspect wrongdoing exists. What the stockholder knew is not dispositive.

---

[39] *See NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys.*, 282 A.3d 1, 26 (Del. 2022) ("[W]e cannot conclude that the Court of Chancery abused its discretion in determining that the Stockholders established a credible basis for inspection."); *Sec. First*, 687 A.2d at 567 (noting that the trial court "properly relied on all the evidence adduced at trial," including "credibility assessments of live witnesses" when finding that the stockholder proved a proper purpose).

[40] The Proper Purpose Decision explained why stockholders should be encouraged to state the bases for their proper purposes in their demands, because doing so promotes the private resolution of books-and-records disputes. The Proper Purpose Decision furthered that goal by asking whether the Stockholder could have obtained the evidence not included in the Demand before serving the Demand. *See PPD* at *11. Judges should not reward stockholders for holding back material that they could have presented in their demands. But that is different from foreclosing the introduction of post-demand or post-enforcement-action evidence.

[41] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1032 (Del. 1996) ("[The stockholder's] subjective belief that wrongdoing has occurred is insufficient to meet the evidentiary burden required to compel inspection"); *Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *5 (Del. Ch. July 30, 2004) (explaining that while the stockholder might have been extra suspicious about the corporation's actions based on past experience, "[t]hat heightened suspicion, however, is not

Once a stockholder has filed an enforcement action and the matter is in litigation, the court should have discretion to oversee the case and, if warranted, consider post-demand or post-enforcement-action evidence. The Company claims that "there is no legal nor logical basis to allow submission of evidentiary materials not in existence at the time of the demand," but there is: the language of Section 220, the rules of civil procedure, the rules of evidence, and the importance of avoiding unnecessary expenditure of judicial resources through serial do-overs of Section 220 proceedings.

On the facts of this case, the court reasoned that the Stockholder could rely on the articles and SEC filings because the Stockholder could not have identified them before sending the Demand through reasonable effort, and the Stockholder promptly identified the evidence during the litigation. The court noted that the materials described the Company's own conduct and the actions of its representatives, negating any prejudice to the Company.[42] The court also noted that the Company itself relied on post-Demand events and cited seven post-Demand news articles in its own pre-trial brief, demonstrating the legitimacy of citing those types of materials.[43] The

---

relevant to the issue before the Court—namely, whether Plaintiffs have shown a credible basis from which the Court can infer the possibility of mismanagement").

[42] *See* Dkt. 28 at 20 n.3.

[43] Dkt. 28 at 7 (citing JX 49); *id.* at 13 n.1 (citing JX 56, JX 63); *id* at 13–15 (citing JX 59, JXs 60–62); *id.* at 23 (citing JX 64).

Company did not object to the use of the post-Demand evidence before the trial,[44] and the Company addressed the post-Demand events in its pre-trial brief without objecting on the basis of prejudice.[45] The court also considered whether to require the Stockholder to file a new demand, finding that it would be inefficient and wasteful.

That said, the Company is correct that the Delaware Supreme Court does not appear to have had the opportunity to address whether a stockholder or a corporation can rely on post-demand or post-enforcement-action evidence to support or defeat a proper purpose. While factor (A) is technically inapplicable, that reality provides some support for certification.

## 2. Whether Decisions Of The Trial Courts Conflict

The Application twice cites factor (B),[46] which asks whether "[t]he decisions of the trial courts are conflicting upon the question of law."[47] Although not clearly satisfied either, this factor also provides some support for certification.

### a. Consideration Of Post-Demand Or Post-Enforcement-Action Evidence

The Company argues that the Proper Purpose Decision conflicts with trial court rulings holding that the court can only consider evidence available at the time the demand was served. The magistrate judge declined to consider the post-Demand

[44] Dkt. 30 Ex. B.

[45] *See* Dkt. 28 at 20 n.3.

[46] Appl. 11, 23.

[47] Supr. Ct. R. 42(b)(iii)(B).

21

and post-enforcement-action evidence in this case and had taken a similar approach in another transcript ruling that became a final ruling of the court.[48] Both the Proper Purpose Decision and the magistrate judge's rulings reach case-specific results, so technically there is no conflict. The decisions nevertheless reflect different underlying approaches, making it desirable for the Delaware Supreme Court to weigh in.

The Company also claims that the Proper Purpose Decision conflicts with the Delaware Supreme Court's observation in the *News Corp.* case that a corporation has a right "to receive and consider a demand in *proper form before litigation is initiated.*"[49] There is no conflict, because that observation refers to the form-and-manner requirements in Section 220(b). A stockholder must serve a demand that complies with the form-and-manner requirements before the stockholder has an actionable right to enforce a right to books and records. Compliance is analogous to establishing standing. A stockholder must therefore make a demand (1) in writing, (2) under oath, (3) addressed to the corporation at its registered agent or principal place of business, (4) with evidence of beneficial ownership if applicable, and (5) with a power of attorney if sent by an agent.[50] The demand also must state a conceptually

---

[48] *In re New Relic, Inc.*, C.A. No. 2023-1089-SEM, at 17–18 (Del. Ch. July 22, 2024) (TRANSCRIPT).

[49] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 146 (Del. 2012) (emphasis in original).

[50] *See* 8 *Del. C.* § 220(b).

legally proper purpose.[51] A stockholder cannot fix non-compliance with the form-and-manner requirements using post-demand or post-petition evidence. Not so for purposes of proving a conceptually proper purpose, such as establishing a credible basis to suspect wrongdoing. Section 220(c) governs the proof of a proper purpose, which takes place at trial and does not turn on what the stockholder subjectively knew or believed when making the demand. The test is objective, and the stockholder must establish to the court's satisfaction that a credible basis to suspect possible wrongdoing exists.[52]

Factor (B) therefore technically does not call for certifying an interlocutory appeal about considering post-demand or post-petition evidence. But the difference

---

[51] *Compare Sec. First*, 687 A.2d at 567 (noting that "[t]his Court reviews *de novo* the question of a 'proper purpose' under Section 220(b)") *with NVIDIA*, 282 A.3d at 26 (reviewing for abuse of discretion trial court's finding that a stockholder established a proper purpose at trial).

[52] *See Thomas & Betts*, 681 A.2d at 1032 ("[The stockholder's] subjective belief that wrongdoing has occurred is insufficient to meet the evidentiary burden required to compel inspection"); *Marathon P'rs,* 2004 WL 1728604, at *5 (explaining that while the stockholder might have been extra suspicious about the corporation's actions based on past experience, "[t]hat heightened suspicion, however, is not relevant to the issue before the Court—namely, whether Plaintiffs have shown a credible basis from which the Court can infer the possibility of mismanagement").

By contrast, it does matter if a stockholder has a subjectively *improper* purpose, which can defeat an inspection even when a stockholder can prove to the court's satisfaction that a credible basis to suspect wrongdoing exists. *E.g.*, *Senetas Corp., Ltd. v. DeepRadiology Corp.*, 2019 WL 3430481, at *8 (Del. Ch. July 30, 2019) (finding that stockholder established a proper purpose by proving a credible basis to suspect corporate wrongdoing, then considering whether the stockholder nevertheless harbored an improper purpose), *report and recommendation approved,* 2019 WL 3578393 (Del. Ch. Aug. 5, 2019).

in the approach taken by this court and the magistrate judge does provide some support for interlocutory review.

### b. Consideration Of News Articles Relying On Anonymous Sources

The Company also argues that the Proper Purpose Decision conflicts with other rulings about when a court can consider hearsay, particularly in the form of news articles that rely on confidential sources. That assertion misrepresents the Proper Purpose Decision. Again, factor (B) does not technically apply, but there is some support for interlocutory review.

For starters, the Company tries to gain a linguistic advantage by calling the sources "anonymous." They are not anonymous. They are confidential. The journalists know who the sources are and determined that they were sufficiently reliable to cite. The journalists' editors also determined that they sources were sufficiently reliable to cite. The Stockholder was not relying on anonymous postings on a social media feed or message board.

The Company maintains that the Proper Purpose Decision established a brightline rule about considering confidential sources in news articles that conflicts with two Delaware Supreme Court rulings: *NVIDIA*'s holding that each item of hearsay evidence must be judged "sufficiently reliable" for consideration[53] and *Thomas & Betts*' instruction that hearsay evidence should neither "lack independent

---

[53] *NVIDIA*, 282 A.3d at 21–22.

24

guarantees of trustworthiness" nor appear "inherently unreliable."[54] The Company

claims that the Proper Purpose Decision did not "focus on . . . the anonymous quotes

themselves" and insists that to comply with *NVIDIA* and *Thomas & Betts*, the trial

court must conduct a meticulous review of each confidential quotation on a "case-by-

case, source-by-source basis."[55]

The Company mischaracterizes the Proper Purpose Decision. The decision

followed *NVIDIA* and *Thomas & Betts*. The court conducted exactly the kind of

analysis that the Application touts as "review[ing] the substance of the articles

presented . . . to determine if they support a credible basis."[56] The Application holds

out the *Lennar* decision as an example of what should be done, and the Proper

Purpose Decision did the same thing. The *Lennar* court looked at key assertions in

the reports at issue[57] and summarized its assessment while making observations

about administrative investigations generally.[58] So did the Proper Purpose Decision.

The court examined the key assertions in the articles, supported each finding with

---

[54] *Thomas & Betts*, 681 A.2d at 1032.

[55] Appl. 12 (citing *NVIDIA*, 282 A.3d at 22; *Thomas & Betts*, 681 A.2d at 1032); *accord id.* at 13 (criticizing the Proper Purpose Decision for not "evaluating the reliability of each anonymous statement Plaintiff relies on" and for not "specifically evaluating the reliability of the challenged anonymous statements themselves").

[56] Appl. 13 (citing *La. Mun. Police Empls. Ret. Sys. v. Lennar*, 2012 WL 4760881 (Del. Ch. Oct. 5, 2012)).

[57] *Lennar*, 2012 WL 4760881, at *4.

[58] *Id.*

25

citations to the record,[59] and relied its knowledge about reporting during M&A processes.[60] Additionally, *Thomas & Betts* teaches that such substantive review must look into the hearsay declarant's motivation.[61] The Proper Purpose Decision did just that.[62]

The trial court closely examined all forty-seven news articles and the quotations they contained, considering their contents individually and collectively. Cognizant of its readers' time, the court did not repeat that detailed analysis in the Proper Purpose Decision. The opinion provided factual and legal highlights, summarized the articles' primary assertions, and observed when the Company's public filings confirmed those assertions.[63] To better present its findings, the Proper Purpose Decision grouped publications together. So did the magistrate judge, whose

---

[59] *PPD* at *2–7.

[60] *PPD* at *15.

[61] *Thomas & Betts*, 681 A.2d at 1032 ("[A]s the trial court found, [the insider] was actively engaged in the process of defecting to the [stockholder] camp. Statements made in this context lack independent guarantees of trustworthiness and are inherently unreliable.").

[62] The court also did a deep dive into journalistic practices regarding the use of anonymous sources. *PPD* at *14, *14 n.78. That analysis of the sources and the reporters' motivations factored into court's credibility determination. Not only that, but the Proper Purpose Decision carefully distinguished what the articles reported from the fact of the reporting itself. *See id.* at *2–7.

[63] *Id.* at *3–4, *15 n.86.

recommendation the Company embraces. So did the Company when briefing the exceptions and its Application.[64]

When summarizing its analysis, the Proper Purpose Decision noted that many articles were lengthy and detailed, the vast majority were from reputable publications like the *Wall Street Journal*, the *New York Times*, the *Financial Times*, and *Bloomberg*, and none bore any indicia of unreliability, such as the motivated testimony found problematic in *Thomas & Betts*. The court also considered the credibility of the particular journalists who authored the articles (many of whom were senior reporters or editors who had won prizes for their work), how the articles used confidential sources, and the policies that the pertinent publications had regarding their use.

The court also evaluated the specific types of confidential sources the articles used, noting that their authors relied on standard identifiers like "people close to the negotiations" or "sources briefed on the process." Those identifiers are not

---

[64] In fact, the Company applauded the magistrate judge for having said that she "reviewed all of the [articles cited by Plaintiff] closely." Appl. 13. The magistrate judge is a conscientious jurist, and doubtless she did. But her transcript ruling devotes only two pages to the confidential sources and does not include any quotations or citations. She instead said, "I'm not going to summarize each article in turn, but I have reviewed all of them closely, and I find they share common indicia of unreliability." Dkt. 54 at 20–21. The Proper Purpose Decision conducted a more lengthy and detailed analysis that included specific citations to and quotations from twenty-eight of the forty-seven articles. *See PPD* at *14–16, *15 nn.80–87. Yet the Company disparages the Proper Purpose Decision for not "evaluating the reliability of each anonymous statement Plaintiff relies on." Appl. 13. The Company thus applies an inverted double standard in which less becomes more and more becomes less depending on whether the Company likes the result.

conspiratorial dodges. Editorial guidelines regulate their use, and the journalists, their editors, and their parent publications have an interest in maintaining readers' trust.[65] These identifiers indicate that the reporters based the reports on sources who knew the information first hand or learned it from those who did. The articles also appeared to use the sources carefully by citing them for specific pieces of information that the Company often confirmed in subsequent SEC filings.[66] Although the articles avoided disclosing factual particulars that could reveal the sources' identities, and although that meant the court could not evaluate the credibility of the specific individuals involved, the attributes of the articles as a whole supported the credibility of the confidential sources they used. The Company itself relied on seven news articles in its pre-trial brief, including from the same publication and even the same journalist as the articles the Company found objectionable.[67]

In issuing the Proper Purpose Decision, the court also relied on his twenty-nine years of experience with M&A scenarios, first as a practitioner and later as a trial judge. As George R.R. Martin aptly expressed through the mouths of the

---

[65] *See PPD* at \*14 n.78.

[66] *See, e.g.*, JX 72 (announcing the two-step Skydance Deal confirming pre-announcement scoops); *id.* at 72 at '009, '014 (announcing the formation of the Special Committee); JX 48 at '004 (announcing Bakish's termination); JX 44 at '007, '018 (indicating the departure of the four directors).

[67] Dkt. 28 at 13 n.1 (citing JX 56, JX 63); *id* at 13–14 (citing JX 59 –61, JX 62); *id.* at 23 (citing JX 64). The Company cited news articles by *Variety*, *CBS News*, the *Hollywood Reporter*, the *Wall Street Journal*, the *New York Times*, *Deadline*, and *Reuters*, including a story by Jessica Toonkel, who authored most of the *Wall Street Journal* articles the Stockholder relied on. *See* JX 61.

Dothraki, sometimes "it is known."[68] Here, it is known that in an M&A setting, the individuals speaking confidentially to reporters are usually the parties' public relations firms, their investment bankers, sometimes their lawyers, and sometimes internal personnel, such as an in-house public relations person or someone from the investor relations department. "The sources are not random people off the street. They are people who know what they are talking about."[69]

The Proper Purpose Decision further noted that the Delaware Supreme Court has recognized reliance on confidential sources as a foundational aspect of the freedom of the press and the protections afforded under the First Amendment,[70] as has the Supreme Court of the United States.[71] The Proper Purpose Decision provided that background because the Company approached the confidential sources with near-conspiratorial suspicion, notwithstanding the many factors supporting their reliability. That is not how the United States Constitution and our law regard the press.

Factor (B) therefore technically does not justify certifying the court's ruling on articles that cited confidential sources. But the Company is correct that the Delaware

---

[68] *See, e.g.*, George R.R. Martin, *A Game of Thrones: Book One of A Song of Ice and Fire* 235 (Bantam Books Mass Market Movie Tie-in ed. 2011).

[69] *PPD* at *15.

[70] *In re Opinion of the Justices*, 324 A.2d 211 (Del. 1974) (holding a proposed anti-anonymity law unconstitutional as applied to newspapers); *see also* Reporters' Privilege Act, 10 *Del. C.* §§ 4320–26.

[71] *See Talley v. California*, 362 U.S. 60, 64–65 (1960).

Supreme Court has not had the opportunity to address this specific issue. That fact provides some support for interlocutory review.

### 3. Whether The Proper Purpose Decision Involves The Construction Of A Statute That The Supreme Court Should Settle Now

The Application once cites factor (C),[72] which asks whether "[t]he question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order."[73] This factor does not support certification.

The Company's invocation of factor (C) consists of a single sentence: "Indeed, to the extent that the Opinion advances a novel 'construction[] . . . of a statute'—Section 220—'which has not been, but should be, settled by this Court in advance of an appeal from a final order,' it also meets the criterion of Rule 42(B)(iii)(C)."[74] The Company then makes arguments that this decision has already discussed under factor (A), which the same section of the Application principally invokes.[75]

In addition, factor (C) requires more than just a construction of a statute. It also requires a construction which has not been, but should be, settled by this Court

---

[72] Appl. 8.

[73] Supr. Ct. R. 42(b)(iii)(C).

[74] Appl. 8 (alteration in original) (citing Supr. Ct. R. 42(b)(iii)(C)).

[75] *See* Appl. 8 ("The Opinion advances a novel legal rule . . . , meeting the criteria in Rule 42(b)(iii)(A).").

*in advance of an appeal from a final order*. The Company does not discuss the additional criterion.

The Company therefore failed to show that factor (C) supports certification.

### 4. Whether The Proper Purpose Decision Involves Appellate Review.

The Application contains one citation to factor (E),[76] which asks whether

> [t]he interlocutory order has reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and a review of the interlocutory order may terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice.[77]

This factor does not support certification.

The Company's sole argument on this subject consists of a single sentence: "Overruling Magistrate Molina's decision, the Opinion satisfies the criterion in Rule 42(b)(iii)(E)."[78] The Company did not cite any authority for treating a magistrate judge's recommendation (or that of a commissioner or special magistrate) as a "prior decision of the trial court" for purposes of factor (E). A magistrate judge in fact makes a recommendation, which only becomes a ruling of the court if (1) no timely exceptions are taken or (2) the court adopts the recommendation.[79] To note that reality is not to

---

[76] Appl. 9.

[77] Supr. Ct. R. 42(b)(iii)(E).

[78] Appl. 9.

[79] *See* Ch. Ct. R. 144.

diminish the highly valuable work that the magistrate judges perform, without which the court would be unable to function.

Here, the Stockholder filed exceptions, and the court did not adopt the magistrate judge's recommendation. The magistrate judge's report remained a recommendation, not a prior ruling of the trial court. Factor (E) does not apply.

### 5. Whether Review Would Terminate The Litigation

The Application contains one citation to factor (G),[80] which asks whether "[r]eview of the interlocutory order may terminate the litigation."[81] The Company's argument appears in a footnote that consists entirely of the following assertion: "Accordingly, this Application also satisfies the criterion in Rule 42(b)(iii)(G)." That footnote in turn follows a sentence that states: "Excluding post-demand evidence and the unconfirmed anonymous statements the Demand relied on would change that answer [referring to the finding of a proper purpose], eliminate the credible basis supporting Plaintiff's proper purpose, and terminate this litigation."[82]

That is not necessarily true. The court has not analyzed whether the Stockholder would have had a credible basis to investigate corporate wrongdoing without relying on post-Demand or post-enforcement-action evidence or the news articles that contain quotations attributed to confidential sources. It is possible that

---

[80] Appl. 6 n.2.

[81] Supr. Ct. R. 42(b)(iii)(G).

[82] Appl. 6.

the court would agree with the Company, but that outcome is not certain. The Application thus differs from an interlocutory appeal seeking review of the denial of a motion to dismiss, where reversing and granting the motion will terminate the litigation. Even there, Delaware authorities do not routinely apply the potential termination factor, because otherwise interlocutory appeals from denials of motions to dismiss would proliferate.[83] Here, the Company cannot yet establish that the litigation would end. This factor therefore does not support certification.

### 6. Whether Review Would Serve Considerations Of Justice

Finally, the Application contains one citation to factor (H),[84] which asks whether "[r]eview of the interlocutory order may serve considerations of justice."[85] This factor provides some support for certification.

To support this factor, the Application advances a policy argument:

> With 220-demand litigation proliferating, the time is ripe for the Delaware supreme Court to supplement the relatively thin body of caselaw instructing lower courts on the evidentiary principles to apply when assessing a stockholder's credible basis for inferring corporate wrongdoing. . . . No Supreme Court precedent dictates whether post-demand evidence and anonymous hearsay alone may sustain a demand. . . . [M]ore guidance is needed to prevent the harm to Delaware corporations posed by unsubstantiated Section 220 demands. Besides

---

[83] *U.S. Dominion, Inc. v. Fox News Network, LLC*, 2022 WL 100820, at *7 (Del. Jan. 10, 2022) ("The Application, if accepted on this argument, would validate routine appeals from most motion to dismiss decisions. Conversely, the Opinion's finding that the Complaint states a claim is not exceptional. Accordingly, Rule 42(b)(iii)(G) does not support the Application.").

[84] Appl. 8.

[85] Supr. Ct. R. 42(b)(iii)(H).

resolving a substantial issue under Rule 42(b)(i), then, interlocutory review will serve the interests of justice, satisfying Rule 42(b)(iii)(H).[86]

Although presented as an "and by the way" addition to an argument about whether the Proper Purpose Decision decided a substantial issue, the passage makes a fair point.

It is always helpful to have the Delaware Supreme Court's views on an issue. Here, this trial judge believes it would be beneficial for the justices to weigh in at this stage of the case.

## D.     The Balancing

As a final step, Rule 42 directs the trial court to engage in balancing:

> After considering [the eight] factors and its own assessment of the most efficient and just schedule to resolve the case, the trial court should identify whether and why the likely benefits of interlocutory review outweigh the probable costs, such that interlocutory review is in the interests of justice. If the balance is uncertain, the trial court should refuse to certify the interlocutory appeal.[87]

There must be "substantial benefits that will outweigh the certain costs that accompany an interlocutory appeal."[88]

There are two paths forward. One is for the Delaware Supreme Court to review the Proper Purpose Decision now. The other is for the case to proceed to a final order first. For that to happen, the next step will be for the magistrate judge to identify the

[86] Appl. 7–8 (citations omitted).

[87] Supr. Ct. R. 42(b)(iii).

[88] Supr. Ct. R. 42(b)(ii).

books and records that are necessary and essential to the Stockholder's proper purpose. Determining the books and records to which a stockholder is entitled is not always an easy task, and either or both sides may file exceptions to the magistrate judge's recommendation.

There are likely to be more fights and more exceptions. Paramount has already flagged its disagreement with a series of other issues.[89] As between the prospect of gaining the benefit of the Delaware Supreme Court's insights now versus having the parties continue to litigate this hotly contested dispute, the former seems preferable. That consideration favors certification.

## III. CONCLUSION

Taken together, this trial judge believes certification is warranted. The Proper Purpose Decision addressed a substantial issue, but each of the factors that a court considers when deciding whether to certify a ruling on a substantial issue either presents a debatable call or does not apply. Overall, however, the Company has made a case for interlocutory appeal.

Ultimately, whether to accept an interlocutory appeal lies in the discretion of the Delaware Supreme Court. The justices' views, not the trial court's, determine whether the request will be granted. This court's role under Rule 42 is to make a

---

[89] *See* Appl. at 5 n.1 ("Paramount reserves its right to appeal all other findings in the Opinion upon final judgment. Paramount further reserves its right to press all arguments not addressed in the Opinion, including mootness, upon remand.").

35

recommendation. In this case, that recommendation is for the Delaware Supreme

Court to accept the interlocutory appeal.